**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**GOBEIL and LAND, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 13, 2023**

# In the Court of Appeals of Georgia

A22A1584. ROUNDS et al v. HALL COUNTY et al.

LAND, Judge.

This is a putative class action lawsuit against Hall County, its Board of Commissioners, and the Association County Commissioners of Georgia (collectively, "Defendants"), alleging that the pension rights of certain Hall County employees (collectively, "Plaintiffs") were violated when the County froze the accrual of employee benefits under its defined benefit plan ("DBP"), effective July 1, 1998, without giving prior notice to the employees and without holding a hearing for the purpose of discussing this benefit accrual freeze. The dispositive issue in this case is whether the County was obligated to provide such notice and hearing before instituting the freeze. For the reasons discussed below, we hold that there was no such

obligation and that summary judgment was properly granted in favor of the Defendants.[1]

The freezing of the employees' accrued benefits under the DBP occurred in July of 1998 when the County adopted a defined contribution plan (the "DCP") for its employees and stopped making contributions to the DBP. When this occurred, the County did not terminate the DBP. Rather, it stopped contributing to that plan and froze the employees' benefits that had accrued up to that point in time. These benefits are being held for the benefit of the affected employees and have not gone away.

Plaintiffs allege that the freezing of the accrued benefits constitutes a termination of the DBP, triggering that plan's notice and hearing requirement. Specifically, the DBP, as it existed after the County's adoption of its revised form in 1998, contained a provision requiring advance notice to the employees of any plan termination along with the obligation to provide a hearing before termination could

---

[1] This is the second appearance of this case before this Court. In a prior unpublished opinion, *Rounds et al. v. Hall County, Georgia et al.*, __ Ga. App. __ (Case No. A20A1226, decided November 3, 2020), this Court affirmed the trial court's grant of summary judgment to Hall County as to Plaintiffs' breach of fiduciary duty claim and to ACCG as to Plaintiffs' breach of contract claim, but vacated the trial court's grant of summary judgment to Hall County as to Plaintiffs' breach of contract, impairment of contract, and ultra vires claims. . At issue before us now is the trial court's grant of summary judgment to Hall County on Plaintiffs' breach of contract and impairment of contract claims.

2

occur. There are two problems with Plaintiffs' argument, both of which are fatal to their claims.

First, the notice and hearing requirement had never been part of the DBP prior to the 1998 transaction that resulted in the freezing of benefits under that plan and the adoption of the DCP. Thus, prior to this transaction and the execution of the documents in connection with it, there was no notice and hearing requirement that applied to any plan termination. Second, and more fundamentally, there was no plan termination in this case. The DBP has been altered in that benefits have been frozen and no further contributions are being made to it, but the accrued benefits are still being held and administered for the affected employees. Thus, the DBP provision requiring a hearing and notice that was adopted as part of the transaction at issue in this case was never triggered by any plan termination. Hence, it does not apply. For both of these reasons, the decision of the trial court granting summary judgment for the Defendants is affirmed.

Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). We review the grant

3

or denial of a motion for summary judgment de novo, and "view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant." (Citations and punctuation omitted.) *AgSouth FarmCredit, ACA v. West*, 352 Ga. App. 751, 752 (835 SE2d 730) (2019). "Nevertheless, if a defendant who does not bear the burden of proof at trial demonstrates that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case, the burden shifts to the nonmoving party to point out specific evidence giving rise to a triable issue." (Citation and punctuation omitted.) *Smith v. Morris, Manning & Martin, LLP*, 293 Ga. App. 153, 160-161 (666 SE2d 683) (2008). Although nonmovants are "entitled to all reasonable inferences from the evidence presented, such inferences cannot be based upon mere conjecture or possibility." (Citation omitted.) *Norman v. Jones Lang LaSalle Americas*, 277 Ga. App. 621, 625 (1) (627 SE2d 382) (2006).

So viewed, the record shows that on December 4, 1972, the Hall County Board of Commissioners (the "Board") passed a resolution to adopt a retirement program for its employees in accordance with a plan approved by the Association County Commissioners of Georgia ("ACCG"). Fifteen years later, in 1987, Hall County adopted a Defined Benefit Plan previously adopted and approved by ACCG. As

4

pertinent to this case, this 1987 DBP gave Hall County the right to amend the plan, subject to certain limitations not applicable here. That version of the DBP contained no notice or hearing requirements for any amendments or terminations of the plan.

*Hall County Considers a Freeze of Accruals Under the Defined Benefit Plan and a Switch to a Defined Contribution Plan.* By 1997, Hall County had begun to consider making changes to its employee retirement plan. In the latter part of that year, the Hall County administrator instructed Hall County's director of human resources to explore whether a DCP would improve the County's retirement plan. The human resources director then presented a proposal for the establishment of a DCP that would eventually take the place of the existing DBP. However, because employees had accrued benefits under the DBP, the County chose not to simply terminate the DBP and replace it with a DCP. Rather, the County chose to create a new DCP, stop contributions under the existing DBP, and implement a freeze of the employees' accrued benefits under the DBP. As a result, the DBP stayed in existence (albeit in an altered state) so that those employees with accrued benefits would not lose those benefits. The DBP benefits were frozen so that the affected employees would receive, upon retirement, the amount they were entitled to receive under the DBP as of the effective date of the DCP. These same employees would also be

5

participants in the DCP and would receive whatever they were entitled to under that plan as well.

In February 1998, the County's pension committee issued a memorandum in support of this concept. On February 25, 1998, the Board unanimously approved two resolutions to make changes to Hall County's pension plan in accordance with the above proposal. The first resolution provided for the creation of a DCP, stating that the County "wishes to provide employees with the [ACCG] [DCP] in addition to their already established ACCG [DBP]." The second resolution provided for the freeze of accruals under the DBP as of the effective date of the DCP and stated that "all other plan features shall continue and all assets shall remain part of the ACCG Pension [Plan and] Trust for the benefit of all active participants[.]" Both resolutions, signed by the Chairman of the Board, authorized the Chairman to sign any documents necessary to carry out the pension plan changes approved by the Board, and both resolutions incorporated and attached the pension committee's memorandum.

*The Chairman of the Board Establishes a DCP and Freezes Accruals Under the DBP.* On June 30, 1998, the Chairman of the Board signed an adoption agreement for the Hall County Money Purchase Plan, which established the DCP with an effective date of July 1, 1998. On July 1, 1998, the Chairman signed a board

6

resolution (the "Freeze Resolution") stating that the County wished to amend the existing DBP and providing that the DBP "shall be frozen as of the Effective Date of the Hall County Money Purchase Plan" (July 1, 1998). The Freeze Resolution went on to state that "all accruals under the Plan formula . . . shall cease as of the Effective Date of the Hall County Money Purchase Plan [July 1, 1998], and the accrued benefits of all active participants as of said date shall remain frozen . . . ." The Freeze Resolution was identical to the resolution approved by the Board and signed by the Chairman on February 25, 1998.

*The Adoption Agreement for the ACCG's Revised and Restated DBP.* On August 18, 1998, the Pension Service Company ("PSC") sent a letter to Hall County's human resources department regarding the "Hall County Adoption Agreement–Effective July 1, 1998." This letter informed Hall County that the ACCG Board of Trustees had approved a revised and restated DBP in 1997 ("ACCG 1997 Plan") and stated that the County's documents executed as part of the above transaction needed to reference this revised and restated DBP rather than the earlier version of the DBP. Specifically, the letter stated:

Last year, the ACCG Board of Trustees approved [a revised and restated DBP], and the adoption agreement needs to address the provisions of this Restated Plan . . . .

Since Hall County is freezing the [DBP], the [Adoption] Agreement should reference the proper sections and paragraphs of the [revised and restated DBP] instead of the former document. Therefore, the appropriate sections of the Adoption Agreement signed by [the Chairman] on June 30, 1998 have been updated . . . .

The PSC requested that the Chairman either attach the original signature page to the revised adoption agreement or that he could "sign again" and the executive director of ACCG would countersign.

After receiving this letter, Hall County had the revised documents signed by its Chairman, and its human resources director returned them to the PSC with a letter dated September 22, 1998. The signed documents returned to the PSC included two copies of the Freeze Amendment signed by the Chairman with a typewritten date of June 30, 1998, and a copy of the revised and restated DBP Adoption Agreement (the "1998 Adoption Agreement") also bearing the signature of the Chairman with a typewritten date of June 30, 1998. The signature page for the 1998 Adoption Agreement included a footer stating "revised 7/98."

8

On September 28, 1998, the executive director ACCG countersigned the 1998 Adoption Agreement and the Freeze Amendment, although both documents contain a typewritten date of June 30, 1998. The 1998 Adoption Agreement also contains a footer stating "revised 7/98."[2]

*The Chairman Signs an Amended Adoption Agreement for the DBP.* On November 13, 1999, the PSC sent Hall County's director of human resources a proposed amended Adoption Agreement for the DBP (the "1999 Adoption Agreement"), which, according to the PSC, clarified eligibility requirements to receive unreduced early retirement benefits. In a November 22, 1999 memorandum, the director of human resources recommended to the Board that this amendment be adopted to "correct[] a miss-print [sic]". On December 9, 1999, the Board voted by consent to "approve the Defined Benefit Plan to clarify [the] pension adoption agreement," and the 1999 Adoption Agreement was signed by the Chairman that day. The 1999 Adoption Agreement states, in relevant part, that "[t]he employer is

[2] When shown a copy of the executed signature page of the 1998 Adoption Agreement and asked whether the agreement was "signed into law effective June 30, 1998," the Chairman testified "[y]es." When asked whether June 30, 1998 was "the date of the Board of Commissioners meeting that you signed [the Adoption Agreement] with authority of a vote[?]" the Chairman testified that he did not remember "what the date was."

adopting this plan in substitution for and as an amendment to an existing retirement plan, the original plan being established December 1, 1972."

*Hall County and the ACCG Continue to Administer the DCP and the Freeze of the DBP.* The County's 2001 adoption agreement for the ACCG's third restated benefit plan, as well as several resolutions since that time, confirm that although future contributions to the DBP were frozen effective July 1, 1998, it is still in existence for the benefit of employees. Hall County and the ACCG have continued to administer the DCP as well as the frozen DBP up until the present.

*The Notice and Hearing Requirement That Forms the Basis of Plaintiffs' Claims.* The 1997 ACCG Plan (adopted by Hall County in 1998) contains the following provisions regarding plan terminations:

> 19.04. *TERMINATION BY PLAN SPONSOR.* The Plan Sponsor[3] shall have the right, at any time, to suspend or discontinue contributions under the Plan, and to terminate, at any time, the Plan and the Trust created under this Agreement or the Restated Declaration of Trust Agreement. The Plan shall terminate upon action of the Plan Sponsor provided the Plan Sponsor gives the Trustees ninety (90) days' prior notice of termination.

---

[3] The 1997 ACCG Plan defines "Plan Sponsor" as the ACCG, and "Trustees" as "the persons appointed as Trustees by the [ACCG] Board of Managers[.]"

19.05. *TERMINATION BY EMPLOYER.* The Employer shall have the right to terminate the Plan upon not less than (90) days' advance written notice to the Trustees. Upon termination of the Plan, the provisions of Section 19.08 (relating to 100% vesting), 12.04 (relating to allocation of Plan assets), and 12.05 (relating to Plan assets in excess of Plan Benefits) shall apply . . .

19.07. *NOTICE REQUIREMENTS.* Prior to any final decision by an Employer to terminate the Plan . . . *an Employer desiring to so terminate or withdraw shall hold a hearing after giving prior written notice to each Employee of the Employer* . . . .

The word "termination" is not defined in the 1997 ACCG Plan.

Plaintiffs' claims hinge on the applicability of the notice requirement found in Section 19.07 of the 1997 ACCG Plan. For the two separate and independent reasons set forth in this Opinion, we conclude that Section 19.07 of that plan has no application to the County's freezing of benefit accruals under the DBP and that Plaintiffs' claims therefore fail as a matter of law.

*This Court's Prior Opinion and Instructions on Remand.* In the prior appeal of this case, this Court vacated the trial court's grant of summary judgment as to the

11

breach of contract claims[4] against the Hall County defendants and remanded the case to the trial court to consider three issues: (1) whether there was a genuine issue of material fact as to the date Hall County adopted the 1997 ACCG Plan; (2) whether the freeze of accruals under the DBP constituted a Plan "termination" triggering Section 19.07 of the 1997 ACCG Plan; and (3) the effect of the Supreme Court of Georgia's decision in *Dekalb County School District v. Gold*, 307 Ga. 330 (834 SE2d 808) (2019) on this case. On remand, the trial court ordered supplemental briefing, held a hearing, and again granted summary judgment in favor of Hall County. Plaintiffs now appeal this ruling.

1. Plaintiffs argue that there is a genuine issue of material fact as to when Hall County adopted the 1997 ACCG Plan and that the trial court erred in construing contradictory evidence against Plaintiffs to find that the 1997 ACCG Plan was not adopted until September 1998. Plaintiffs argue that the record shows that Hall County became bound by the 1997 ACCG Plan on June 30, 1998; that the 1997 ACCG Plan and its notice and hearing requirements were therefore in effect when Hall County froze accruals under the DBP on July 1, 1998; and that, because those notice and

_____

[4] Because the trial court analyzed Plaintiffs' breach of contract claim together with their impairment of contract and ultra vires claims, these rulings were also vacated.

12

hearing requirements were not followed, the freeze on accruals was invalid. We are unpersuaded.

First, even assuming that Hall County's 1998 Adoption Agreement was executed on June 30, 1998 (an assumption that appears to be contrary to the evidence), such a finding would be immaterial because the 1998 Adoption Agreement and Freeze Resolution are documents that were executed as part of one transaction and should, for that reason, be construed together as contemporaneous documents. "Under Georgia rules of contract construction, where multiple documents are executed at the same time in the course of a single transaction, they should be construed together." *Martinez v. DaVita, Inc.*, 266 Ga. App. 723, 727 (598 SE2d 334) (2004) (citing OCGA § 24-6-3 (a) ("[a]ll contemporaneous writings shall be admissible to explain each other."). "[W]ritings may be considered contemporaneous even when they are not executed on the same day as long as they are part of the same transaction." *Patterson v. Bennett St. Properties, L.P.*, 314 Ga. App. 896, 900 (1) (726 SE2d 147) (2012); see also *Manry v. Hendricks*, 66 Ga. App. 442, 453 (1) (18 SE2d 97) (1941) ("One thing is contemporaneous with a given transaction when it is so related in point of time as reasonably to be said to be a part of such transaction.").

13

Because these documents were executed as part of the same transaction (i.e., the creation of the DCP and the corresponding freeze of the DBP), it does not matter whether the County's execution of the 1998 Adoption Agreement occurred on June 30, 1998 or in September of that year. Even if we assume the 1998 Adoption Agreement was executed on June 30, 1998, the County's adoption of the Money Purchase Plan (which established the DCP) occurred the same day, and the Freeze Resolution was executed the very next day. Because all three documents are part of the same transaction, they are considered to be contemporaneous and should be construed together. See *Patterson v. Bennett Street Properties*, 314 Ga. App. 896, 900 (1) (726 SE2d 147) (2012) (guaranty and two other agreements were signed within three days and were part of the same transaction); *Hong Investments v. Sarsfield*, 312 Ga. App. 82, 83 (717 SE2d 679) (2011) (lease and guaranty executed one day apart were sufficiently contemporaneous and part of the same transaction). Because these documents were all part of the same transaction, we hold that the notice and hearing requirement set forth in the 1997 ACCG Plan were not instituted prior to the freeze and thus did not apply to Hall County's contemporaneous freezing of the benefit accruals under the DBP. Accordingly, Plaintiffs' claims fail as a matter of law.

2. There is a second and perhaps more fundamental reason Plaintiffs' claims fail as a matter of law. Stated simply, the DBP freeze was not a termination of the DBP. Thus, even if the 1997 ACCG Plan, with its notice and hearing requirement for plan terminations, was in effect at the time the County froze the DBP (a proposition we reject for the reason set forth in division 1), the notice and hearing requirement was not triggered by the freeze.

"The construction of a contract is peculiarly well suited for disposition by summary judgment because, in the absence of an ambiguity in terms, it is a question of law for the court." (Citations and punctuation omitted.) *George L. Smith Ga. World Congress Center Auth. v. Soft Comdex*, 250 Ga. App. 461, 462 (550 SE2d 704) (2001). An ambiguity exists

> only if after the application of the pertinent rules of interpretation, it remains uncertain which of two or more possible meanings the parties intended. No construction is required or even permissible when the language employed by the parties in the contract is plain, unambiguous and capable of only one reasonable interpretation.

(Citations and punctuation omitted.) Id. In advancing their argument that the plan freeze should be considered a termination, Plaintiffs rely on the rule that "pension Acts must be liberally construed in favor of the rights of the pensioner." *Bd. of*

15

*Trustees of Policemen's Pension Fund of Atlanta v. Christy*, 246 Ga. 553, 555 (1) (272 SE2d 288) (1980), overruled on other grounds by *Mayor & Aldermen of Savannah v. Stevens*, 278 Ga. 166, 167 (2) (598 SE2d 456) (2004). However, the determination of whether the freeze of accruals under the DBP is a termination within the meaning of the pension plan is "ultimately a question for the judiciary." See *Barnett v. Fulton Cnty.*, 255 Ga. 419, 423 (1) (339 SE2d 236) (1986); *Priest v. Peace Officers Annuity & Ben. Fund of Georgia*, 248 Ga. 603, 604 (2) (284 SE2d 257) (1981).

Contrary to Plaintiffs' contention, the trial court correctly applied contract law principles in determining that the notice provisions did not apply to the freeze of accruals under the DBP. As the trial court noted, words should be given their plain meaning. *Perkins v. M&M Office Holdings, LLC.*, 303 Ga. App. 770, 773 (695 SE2d 82) (2010). The settled understanding of what constitutes a plan termination "is part of the legal backdrop that parties bring in when they contract . . . by using that well-known term." See *Milner v. Milner*, 363 Ga. App. 69, 75 (1) (b) (870 SE2d 584) (2022).

Here, the plain language of Section 19.07 of the 1997 ACCG Plan calls for notice and a hearing only "[p]rior to any final decision by an Employer to *terminate*

16

*the Plan*." (Emphasis supplied). "Termination" is not defined in the 1997 ACCG Plan, and we, like the trial court, therefore look to the word's ordinary meaning: "1. The act of ending something; EXTINGUISHMENT . . . 2. The end of something in time or existence; conclusion or discontinuance . . . ." Black's Law Dictionary (11th ed. 2019).

By its plain terms, Section 19.07 of the 1997 ACCG Plan requires written notice and a hearing only if Hall County desires to extinguish, or put an end to, its retirement plan. That is not what Hall County did here. Under the terms of the Freeze Resolution, "all accruals under [the Hall County Defined Benefit] Plan formula . . . shall cease" as of July 1, 1998, and "the accrued benefits of all active participants as of [July 1, 1998] shall remain frozen; *all other plan features shall continue and all assets shall remain part of the ACCG Pension Trust and administered for the benefit of all active participants*[.]" (Emphasis supplied). Based on this plain language, the DBP did not cease to exist on July 1, 1998. Rather, it continued to exist, albeit in an altered state, "for the benefit of all active participants." Accordingly, we conclude that the Freeze Resolution did not terminate the DBP, and Section 19.07 has no application.

17

Section 19.04 of the 1997 ACCG Plan provides further support for our holding. That section states that "[t]he Plan Sponsor shall have the right, at any time, to suspend or discontinue contributions under the Plan, *and* to terminate, at any time, the Plan and the Trust . . . ." (Emphasis supplied). Based on this language, it is apparent that the suspension or discontinuation of contributions under the Plan is different than the termination of the Plan itself. To construe termination as including suspensions or discontinuances of contributions would make Section 19.04 superfluous and redundant. See *Floyd v. Floyd*, 291 Ga. 605, 610 (2), n. 8 (732 SE2d 258) (2012) ("[W]henever possible, a contract should not be construed in a manner that renders any portion of it meaningless.") (citation and punctuation omitted).[5]

[5] Our conclusion is also consistent with established federal law on defined benefit plan terminations, which, while not binding on this Court, is persuasive. Under federal law, a freeze of future accruals in a defined benefit plan is distinct from a termination of the plan. See *Jones v. Singing River Health Servs. Found.*, 742 F.App'x 846, 848 (5th Cir. 2018) (as a result of court order "not to terminate the [retirement] Plan . . . the Plan was "frozen," meaning that no new contributions came in, but benefit payments continued to go out."); *Arndt v. Sec. Bank S.S.B. Employees' Pension Plan*, 182 F3d 538, 540 (7th Cir. 1999) (pension plan was first amended "to freeze the accrual of benefits" and over a year later, trustee "gave notice of its intent to terminate the [pension] plan"); *Chait v. Bernstein*, 835 F2d 1017, 1020-1022 (II) (3d Cir. 1987) (freeze on accrual of further benefits and of pension plan's assets would not terminate pension plan so as to preclude subsequent amendment); *In re AMR Corp.*, 477 BR 384, 404 (Bankr. S.D.N.Y. 2012) ("The most notable change was [the Employer's] decision to freeze its defined pension plans rather than terminate them, which would cease the accrual of new benefits, but preserve benefits

18

3. *Plaintiffs' Novation Argument.* Plaintiffs also contend that the trial court erred in rejecting their argument that the 1999 Adoption Agreement nullified and superseded the 1998 Adoption Agreement, thereby negating the Freeze Resolution. Specifically, Plaintiffs argue that 1999 Adoption Agreement was a novation of the earlier 1998 Adoption Agreement and that since the 1999 Adoption Agreement contains no freeze language, there is no freeze. We are unpersuaded.

"An existing contract is superseded and discharged whenever the parties subsequently enter upon a valid and inconsistent agreement, completely covering the subject-matter which was embraced by the original contract." (Citation and punctuation omitted.) *Atwood Servs., Inc. v. VFH Captive Ins. Co.*, 365 Ga. App. 162, 163-164 (1) (877 SE2d 699) (2022). "Furthermore, to constitute a novation, four essential requisites must exist: (1) a previous valid obligation, (2) the agreement of the parties to a new contract, (3) a mutual intention by the parties to substitute the

---

already accrued as of the date the plans were frozen."); *Baker v. Pennsylvania Econ. League, Inc. Ret. Income Plan*, 811 FSupp2d 1136, 1143 (E.D. Pa. 2011) ("the PEL Board's freeze on accrual of benefits did not terminate the Plan"); *In re Gulf Pension Litig.*, 764 FSupp 1149, 1202 (IV) (S.D. Tex. 1991), aff'd sub nom. *Borst v. Chevron Corp.*, 36 F3d 1308 (5th Cir. 1994) ("The IRS defines a "frozen plan" as one in which all future accruals have ceased but the trust continues in operation . . . . A "terminating plan" results when an amendment has been adopted to terminate the plan but trust assets have not yet been distributed.").

19

new contract for the old one, and (4) the validity of the new contract. If any of the essential elements is lacking, there is no novation." Id. at 164 (citation and punctuation omitted.) The existence of a novation may be shown by parol evidence, and "[t]he question of the parties' mutual intention for [a] . . . novation is ordinarily a question of fact reserved for jury determination." *Feely v. First Am. Bank of Georgia, N.A.*, 206 Ga. App. 53, 56-57 (2) (b) (424 SE2d 345) (1992). "However, where, as in this case, the intent of the parties is shown by clear, plain, and palpable evidence so that the jury can draw but one conclusion, the issue of intent can be decided as a matter of law and the summary judgment can be granted." Id.

Here, the 1999 Adoption Agreement did not completely cover the subject matter set forth in the 1998 Adoption Agreement, a point that Plaintiffs appear to concede. That being the case, there can be no novation. See *City of Buford v. Int'l Sys., Inc.*, 158 Ga. App. 682, 684 (282 SE2d 165) (1981) ("The trial court did not err in awarding summary judgment as the existing contract was not superseded and discharged as they did not enter into a valid and inconsistent agreement completely covering the subject matter embraced by the original contract . . . ."). Further, the record shows that the only purpose of the 1999 Adoption Agreement was to "clarify [the] pension adoption agreement" with respect to the limited issue of unreduced

20

early retirement benefits. This clarification does "not amount to a material deviation from the terms" of the 1998 Adoption Agreement "so as to evidence substitution of the new agreement for the original [adoption] agreement." See *Crow v. Cook*, 215 Ga. App. 558, 561 (1) (a) (451 SE2d 467) (1994) (no novation where amendment to lease "was merely an agreement to correct an apparent error" in the prior lease). See also *Brown v. Lawrenceville Properties, LLC*, 309 Ga. App. 522, 524 (1) (710 SE2d 682) (2011) (parties' corrections to lease did not amount to a novation). For each of these reasons, we reject Plaintiffs' contention that the 1999 Adoption Agreement constituted a novation of the 1998 Adoption Agreement.

4. Plaintiffs also argue that *Dekalb County School District v. Gold*, 307 Ga. 330 (834 SE2d 808) (2019) controls this case and requires reversal. We disagree.

In *Gold*, our Supreme Court held that an amendment to school board bylaws that required a county to provide employees with notice before reducing funding to their retirement plan was a part of the employees' employment contracts, and therefore, the retirement plan's provision allowing for the termination or suspension of the plan "at any time" could not operate to amend this notice provision. 307 Ga. at 336-338 (3). In the present case, unlike in *Gold*, there was no notice provision in effect at the time Hall County froze future accruals of benefits under the DBP and no

notice required for the freeze of benefit accruals. *Gold* has no application to these facts.

5. Finally, Plaintiffs contend that the trial court erred by granting summary judgment on their unconstitutional impairment of contract claims. We disagree.

Breach of contract claims and unconstitutional impairment of contract claims are subject to the same analysis. See *Borders v. City of Atlanta*, 298 Ga. 188, 191 (779 SE2d 279) (2015) ("allegations of violation of the Impairment Clause have historically been treated as raising breach of contract issues"). Because we affirm the trial court's grant of summary judgment on Plaintiffs' breach of contract claim, we also affirm the trial court's grant of summary judgment as to Plaintiffs' unconstitutional impairment of contract claim for the same reasons.

*Judgment affirmed. Gobeil, J., concur*s. *McFadden, P.J., dissents.*

A22A1584. ROUNDS et al. v. HALL COUNTY et al.

McFADDEN, Presiding Judge, dissenting.

I respectfully dissent. As detailed below, I would hold that the 1997 ACCG Plan applies to the actions taken by the County and that those actions constitute a "termination" invoking the requirements for notice and a hearing under the 1997

ACCG Plan. Because I would hold that the 1997 ACCG Plan does apply and that the County's actions constitute a partial termination, thereby invoking the notice and hearing requirements under the 1997 ACCG Plan, I would reverse the trial court's grant of summary judgment to the County.

1. *The 1997 ACCG Plan applies to the County's actions.*

The notice and hearing requirements contained in the ACCG's January 1997 "Second Restated Defined Benefit Plan" (the "1997 ACCG Plan") were in effect on July 1, 1998 when the County resolved to "freeze" its defined benefit plan. The County had adopted the 1997 ACCG Plan in an agreement dated the day before, June 30, 1998. I agree with the majority that we must consider that adoption agreement as part of the same transaction as the documents adopting the new defined contribution plan and freezing the existing defined benefit plan, and that we must construe all of these documents together. Given that we construe the resolution "freezing" the defined benefit plan together with the agreement adopting the 1997 ACCG Plan, it follows that the terms of the 1997 ACCG Plan — including the notice and hearing provision — were in effect and applied to the changes imposed upon the defined benefit plan by the resolution.

2

2. *The County's changes to the defined benefit plan invoked the notice and hearing provisions of the 1997 ACCG Plan.*

The notice and hearing provision is triggered when the "Employer," here the County, decides either to terminate its defined benefit plan or to withdraw from the trust created under that plan. The parties to this case dispute whether the County's act of "freezing" the defined benefit plan was a "termination" invoking those requirements. I would hold that it was.

As the majority notes, the 1997 ACCG Plan does not define the word "termination." But the 1997 ACCG Plan contains an entire article, Article XIX, addressing termination and withdrawal that tells us what those terms mean. The plan provides a means for an employer to contribute to the trust created under the plan. Article XIX of the plan provides for the participants in the plan to receive certain defined benefits from that trust upon termination or withdrawal. That article permits the employer to terminate the plan in full *or in part*, mentioning "full or partial termination" in § 19.08 in reference to the employer's right to terminate. It also imposes detailed directions on the employer, the trustee, and the plan administrator to protect the plan participants if a plan is partially or fully terminated.

3

We must look to the whole of a contract in construing any part of it. OCGA § 13-2-2 (4). Doing so, I construe the treatment of employer-initiated plan "terminations" in the 1997 ACCG Plan, and the protections provided in such instances, to apply to the actions taken by the County in this case. I read Article XIX to specify how an employer may withdraw or terminate the plan. More specifically, it is true that there was no full termination of the defined benefit plan in this case. As the majority notes, the plan continues to be administered. But the County's acts of ceasing its contributions into the defined benefit plan and freezing the accrual of benefits under that plan effectively ended the ability of some participants to obtain the full extent of benefits provided for under the plan. So it amounted to a *partial* termination of the plan.

This interpretation of "termination" accords with the dictionary definition cited by the majority, which includes "[t]he act of ending something" and "conclusion or discontinuance. . . ." Black's Law Dictionary (11th ed. 2019). And it is consistent with the purpose of the provisions that establish protections for plan participants.

I am not persuaded by the majority's argument that language in a separate provision pertaining to the separate issue of ACCG's right to terminate the plan, § 19.04, requires a different construction of "termination." It is true that § 19.04 sets

4

out the right of the plan sponsor, ACCG, to "suspend or discontinue contributions under the Plan," and its right to "terminate, at any time, the Plan and the Trust[.]" But I do not read that section to exclude the acts of "suspend[ing] or discontinu[ing] contributions" from the larger category of terminations, if those acts have the effect of ending the ability of some participants to continue to accrue benefits under the plan.

I also acknowledge that some federal authorities treat the "freeze" of a defined benefit plan differently than a termination, as the majority points out. But other federal authorities rebut the notion that this is a bright-line rule. See, e. g., *In re Gulf Pension Litigation*, 764 FSupp 1149, 1163 (II) (B) (1) (S. D. Tex. 1991) (stating that "IRS revenue rulings suggest an employer-initiated permanent reduction of either a significant number or a significant percent of employees from a plan . . . may constitute a partial termination").

Under the terms of the 1997 ACCG Plan, the County's acts constituted a partial termination, and so the County was required to provide notice and a hearing consistent with § 19.07. Consequently, the trial court erred in granting summary judgment to the County on the plaintiffs' claims for breach of contract and unconstitutional impairment of contract, and I would reverse that ruling.